O.F. IGLEHEART, Mildred Igleheart, Diana Lynn Igleheart, and Michael F. Igleheart, Trustees, and Mary Elizabeth Igleheart, a single woman, Appellees/Counter–Appellants and Third Party Plaintiffs,

v.

Jake WARRINGTON and the Okemah National Bank, Appellants/Counter–Appellees,

v.

SOUTHCO EQUIPMENT, INC., Steel Tank Insurance Co., Smith Tank Co. of Tulsa, Inc., and Steel Tank Institute, Third Party Defendants.

No. 83478.

Court of Appeals of Oklahoma, Division No. 3.

Jan. 24, 1995.

Lawrence W. Parish, Okemah, for appellants/counter-appellees.

Alan E. Synar, Edmond Law Center, Edmond, for appellees/counter-appellants.

## OPINION

ADAMS, Judge:

This appeal involves two separate trial court orders entered by two different trial judges in foreclosure proceedings initiated by Appellees, O.F. Igleheart, Mildred Igleheart, Diana Lynn Igleheart, Michael F. Igleheart, and Mary Elizabeth Igleheart (The Iglehearts) against Appellants Jake Warrington and the Okemah National Bank.[1] The first order, entered by Judge Rahal and filed on April 19, 1993, denied the Iglehearts' motion for summary judgment and dismissed the foreclosure proceedings leaving at issue only Warrington's counterclaims. After the Iglehearts' appeal of that order was dismissed as premature because of Warrington's outstanding counterclaim, the Iglehearts moved for summary judgment on that counterclaim. Judge Maley granted that motion in April, 1994, and entered judgment for the Iglehearts on Warrington's counterclaim.[2] Warrington appeals the latter order while the Iglehearts' counter-appeal asks us to reverse the 1993 order which dismissed their foreclosure claim.

## STANDARD OF REVIEW

In order for summary adjudication to be appropriate, not only must there be no dispute as to material facts, but all reasonable inferences and conclusions to be drawn from those facts must be in one party's favor and show that party is entitled to judgment as a matter of law. *Runyon v. Reid,* 510 P.2d 943 (Okla.1973). The evidentiary materials must be viewed in the light most favorable to the party opposing summary judgment. *Hargrave v. Canadian Valley Elec. Co-op.,* 792 P.2d 50 (Okla.1990). Moreover, any ruling on a motion for summary judgment must be made on the record the parties have actually made and not upon one which is theoretically possible. *Daugherty v. Farmers Co-op Ass'n,* 689 P.2d 947 (Okla. 1984). With these principles in mind, we review the following facts.

## FACTS

By General Warranty Deed dated January 15, 1990, the Iglehearts conveyed to Warrington certain real property on which a retail service station is located. Attached to the deed is "Exhibit A" which contains the legal description of the property and the following paragraph:

> Grantors and Grantees acknowledge that the property has been operated as a retail Service Station for many years. It is the intent of the Grantors, their successors and assigns to hold Grantee, his successors and assigns, harmless from any and all damages, claims, losses, liabilities and expenses which may be asserted against Grantee, his successors and assigns by any party or parties including without limitation a governmental entity or otherwise imposed upon or incurred by Grantee, arising out of or in connection with any environmental condition existing *as of, prior to, or following the date hereof,* including ex-

---

1. For purposes of this appeal, the Bank's interest is identical with Warrington's, thus we refer to him only.

2. The abbreviated record furnished on appeal does not indicate the reason the case was apparently reassigned to Judge Maley. However, no party raises any issue in this regard.

posure of any person to such any such environmental condition. Without limiting the generality of the foregoing, Grantors' obligation under this paragraph shall include but not be limited to liability arising under common law or any federal, state or local law or other governmental requirement. (Emphasis added).

On January 16, 1990, the same parties entered into a Sales Agreement involving the same property, wherein the Iglehearts, as the seller, agreed to the following:

Seller warrants that all tanks, lines, and appurtenances thereto recently installed on the above described real property comply with all state and federal law and Sellers shall hold Purchaser harmless for any and all claims arising prior to the execution of this contract.

The parties further agreed that the terms of the sales agreement "shall survive transfer of the real estate and execution of the instruments according to the terms of this agreement." As required by their agreement, Warrington executed both a promissory note and real estate mortgage. On January 17, 1990, the warranty deed and mortgage were filed of record in the office of the Okfuskee County Clerk.

On February 5, 1992, the Iglehearts filed a foreclosure petition against Warrington and Okemah National Bank.[3] They alleged Warrington had not made monthly note payments since November, 1991, and pursuant to the acceleration clause under the note and mortgage, requested payment of the full indebtedness.

Warrington answered their petition, asserted various affirmative defenses, and without court approval, tendered the equivalent of four months of note payments into the court. His answer also included several counterclaims against the Iglehearts. Warrington alleged the equipment used for the sale of petroleum products was leaking and that the Iglehearts denied responsibility when he notified them of the leaks. There-

fore, Warrington alleged, the Iglehearts had breached the sales agreement and the warranties contained in the deed and the sales agreement. Warrington also alleged the Iglehearts knowingly and fraudulently misrepresented the condition of the premises. Warrington requested cancellation of the note and mortgage and punitive damages.[4]

In March, 1993, the Iglehearts moved for summary judgment based on Warrington's failure to specifically deny the execution of the promissory note and real estate mortgage and based on his admission that he had not made monthly note payments since November, 1991. In response, Warrington contended there was a jury question concerning whether the tank system leaked and whether the Iglehearts had breached the sales agreement and a special warranty provision of the deed. By order filed April 19, 1993, the trial court denied the Iglehearts' motion and based on equitable reasons, dismissed their foreclosure action. The Iglehearts' initial appeal from that order was dismissed as premature by the Oklahoma Supreme Court in July, 1993.

In February, 1994, the Iglehearts again moved for summary judgment. Attaching affidavits and the results of recently performed leak tests, they argued there were no leaks in the underground storage tanks and lines and that the uncontroverted facts demonstrated Warrington was not entitled to recover on his counterclaim. The trial court agreed and granted their motion by its April, 1994 order.

## ANALYSIS

### Warrington's Appeal

■ In his sole allegation of error, Warrington argues the trial court erred in granting summary judgment on his counterclaims because there are disputed material facts concerning the existence of leaks in the tanks at the service station. We agree.

---

3. The bank held a mortgage that was inferior to the Iglehearts' mortgage.

4. The Iglehearts filed a third party petition against the parties who either sold, warranted or

installed the steel tanks on the service station premises. The claim against the third-party defendants was ultimately dismissed.

We need look no further than the results of two leak tests, attached to the Iglehearts' second summary judgment motion and marked as Exhibits E and F, to conclude that summary adjudication was not appropriate. The tests were performed to determine possible leakage from the three 6,063 gallon underground storage tanks located on the premises of the service station which contain three different grades of gasoline—unleaded, unleaded plus, and super unleaded.

The first test was performed for Warrington yet the results (Exhibit F) were presented to prove the Iglehearts' claim that "[t]he lines at the facility do not leak." However, we do not interpret the test results as the Iglehearts do. The ten page report, dated November 4, 1991, explains that the test method used on October 24, 1991, the Leak Computer Tank Test System, met "all the requirements of NFPA 329–87 and 40 CFR Part 20 (U.S.EPA Regulations)," and that the results would indicate whether the "full system," including the tank and all non-pressurized piping, or just the individual tank, passed or failed.

As shown on page 2 of the report, the results of the first test were as follows: (1) In all three tanks, the "full system" failed; (2) The unleaded and unleaded plus tanks passed; (3) The super unleaded tank failed; and (4) The pressurized lines for all three tanks passed. From these results, reasonable minds could infer that there is a leak in the super unleaded tank and possibly in its non-pressurized piping, while the tanks containing the two remaining grades of gasoline, the unleaded and unleaded plus, may have a leak in the non-pressurized piping.

The second leak test, called the "Tracer Tight" leak test, was performed for one of the third party defendants almost two years after the first leak test. The results of this test (Exhibit E) were presented to support the Iglehearts' claim that "[t]he tanks at the facility do not leak." The results of this test may be read as supporting this conclusion.

However, even if we were to conclude that the latter test conclusively demonstrated no leaks in any of the tanks, contrary to the results of the first test, the Iglehearts warranted more than just the tanks. Their war-

ranty included "all tanks, lines and appurtenances." The Iglehearts argue Exhibit E, in conjunction with Exhibit H, also demonstrates that "[t]he system does not currently leak."

Exhibit H is an affidavit of Brian Donovan, President of the Steel Tank Insurance Company, who states that "the test results [tracer test] showed that the tanks were tight, that is, there were no leaks from the steel tanks." However, the next paragraph states that "[n]o leaks were detected in the *lines or pipe fittings* in the tracer test." However, the test results do not indicate whether the non-pressurized pipes which failed the first test were found to be tight. At most, the latter test results merely create a fact issue concerning whether any of the equipment warranted by the Iglehearts failed to meet government specifications. Summary judgment was therefore inappropriate.

### The Iglehearts' Counter–Appeal

The Iglehearts argue that according to the holding in *Murphy v. Fox*, 278 P.2d 820 (Okla.1955), the trial court exceeded its equitable powers in dismissing their mortgage foreclosure action despite the trial court's finding that Warrington had admitted execution of the note and mortgage and that Warrington was in default.

The trial court found Warrington was not entitled to stop payments on the note because he was concerned whether the tanks and lines were leaking. However, the trial court concluded foreclosure would be an unsatisfactory solution, ordered the back payments which Warrington had tendered to be paid to the Iglehearts, and dismissed their foreclosure claim. In effect, the trial court refused to enforce the Iglehearts' right to accelerate the note and forced them to reinstate the note by acceptance of Warrington's late tender.

■ Although a mortgage foreclosure is an equitable proceeding and the trial court may refuse to accelerate a note on equitable grounds, that power should be exercised only sparingly. In *Murphy*, the Court affirmed a trial court decision denying acceleration after concluding the evidence showed only a tech-

nical default due to inattention and inadvertence and that the mortgagee had acted unconscionably in an effort to cause a default. More recently, in *Federal National Mortgage Association v. Walter,* 363 P.2d 293 (Okla.1961), the Court reversed a trial court order denying foreclosure where the debtor argued that the creditor's previous policy of accepting late payments and allowing reinstatement after acceleration had been declared supported exercise of the equitable power recognized in *Murphy.*

In *Continental Federal Savings and Loan Association v. Fetter,* 564 P.2d 1013 (Okla. 1977), the mortgagee insisted that the debtor pay a transfer fee as a condition of the mortgagee's consent to the transfer of the property. The transfer fee was not mentioned in the original contracts, and the mortgagee's security would not have been impaired by the transfer. The debtor refused and sold the property without the mortgagee's assent. Invoking the "due on sale" clause, the mortgagee accelerated the note. Noting that the transfer fee bore no reasonable relationship to the mortgagee's cost for the transaction and that the fee had been unilaterally imposed by the mortgagee, the Oklahoma Supreme Court concluded it would be inequitable to enforce the acceleration clause.

The Tenth Circuit denied use of that power in *Resolution Trust Corporation v. Mustang Partners,* 946 F.2d 103 (10th Cir.1961), where the evidence showed the debtors knew they were in default. In *Greenberg v. Service Business Forms Industries, Inc.,* 882 F.2d 1538 (10th Cir.1989), the Court interpreted Oklahoma law as allowing the exercise of the equitable power to deny acceleration only where the mortgagee had been guilty of inequitable and unconscionable conduct.

■ No similar factors appear in this case. Rather than taking legal action to remedy what he perceived as a breach of the agreement, Warrington chose to withhold payment and now wishes to be relieved of the consequences of that decision. The trial court erred in concluding that equitable principles prevent the Iglehearts from accelerating the debt.

■ However, we do not agree that the Iglehearts were therefore entitled to summary judgment on their foreclosure claim. The Iglehearts' argument that they established a *prima facie* case for foreclosure and thus summary judgment should have been granted overlooks Warrington's counterclaim, including the request for cancellation of the note and mortgage. The Iglehearts' initial summary judgment motion did not demonstrate the absence of a genuine issue as to any material fact concerning these counterclaims. *Martin v. Chapel, Wilkinson, Riggs, and Abney,* 637 P.2d 81 (Okla. 1981).

In *Mid-State Homes, Inc. v. Donnelly,* 574 P.2d 1036 (Okla.1978), the Donnellys contracted with a builder for a shell house on their property and on the same day executed a non-negotiable note, secured by a real estate mortgage, payable to the builder. The builder assigned the note and mortgage to Mid-State Homes. When the home developed problems and the builder did not make appropriate repairs, the Donnellys stopped making the monthly payments. Mid-State sued on the note and to foreclose the mortgage.

■ The *Donnelly* Court affirmed the trial court's conclusion that there was a lack of consideration for the note and its securing mortgage. Citing *Creach v. Home Owners' Loan Corporation,* 191 Okl. 484, 131 P.2d 108 (1942), the Court agreed that the poorly constructed house constituted a material breach of the building contract and that the consideration given for the note and mortgage failed in a material respect. As we interpret *Donnelly,* lack of consideration can be a defense to a mortgage foreclosure under the appropriate facts.

As in *Donnelly,* after the filing of the Iglehearts' foreclosure action, Warrington requested cancellation of the note and mortgage claiming a material breach of the sales agreement and deed. Although in *Donnelly* the assignee of the note and mortgage had no part in the actual construction of the home, cancellation was affirmed since the note was non-negotiable and the assignee had not argued it held the note free of any defenses that could be raised against the

builder. The rule recognized in *Donnelly* is even more appropriate under the circumstances of this case, where the party alleged to have breached the agreement is the party seeking to enforce the note and mortgage.

Warrington claims that the equipment covered by the sales agreement leaked and therefore did not meet government specifications as warranted by the Igleharts. As we have already concluded, the evidentiary material submitted by the parties reveals an issue of controverted fact concerning whether any leaks exist. Because an issue of fact still remains concerning whether the Igleharts materially breached the agreement, it would have been error for the trial court to grant the Igleharts' summary judgment on their foreclosure claim.

## CONCLUSION

The trial court's decisions granting the Igleharts' judgment against Warrington on his counterclaim and concluding the Igleharts could not equitably accelerate the debt under these circumstances are reversed. As a result of this reversal, both the Igleharts' foreclosure claim and Warrington's counterclaim must still be resolved appropriately by the trial court. The case is remanded for further proceedings consistent with the views stated in this opinion.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

GARRETT, C.J., and HUNTER, J., *concur.*